# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF OREGON

| | |
|---|---|
| **MICHAEL KELLY**, | Case No. 3:18-cv-659-SI |
| Plaintiff, | **OPINION AND ORDER** |
| v. | |
| **THE BOEING COMPANY**, | |
| Defendant. | |

Daniel Snyder, Carl Post, and John David Burgess, LAW OFFICES OF DANIEL SNYDER, 1000 SW Broadway, Suite 2400, Portland, Oregon 97205. Of Attorneys for Plaintiff.

James M. Barrett, OGLETREE, DEAKINS, NASH, SMOAK & STEWART, P.C., 222 SW Columbia Street, Suite 1500, Portland, OR 97201; Christopher J. Banks, Karen Y. Cho, and Joseph R. Lewis, MORGAN LEWIS & BOCKIUS LLP, One Market, Spear Street Tower, San Francisco, CA 94105. Of Attorneys for Defendant.

**Michael H. Simon, District Judge.**

Michael Kelly ("Kelly") brings this lawsuit against his former employer, The Boeing Company ("Boeing"), alleging that Boeing violated his rights, discriminated against him, and retaliated against him when it terminated his employment on January 12, 2017. Kelly asserts claims under the Americans with Disabilities Act ("ADA"), the Oregon Rehabilitation Act ("ORA"), the Family and Medical Leave Act ("FMLA"), and the Oregon Family Leave Act ("OFLA"). He also brings common law claims for wrongful termination and intentional

infliction of emotional distress. Kelly seeks money damages, including punitive damages, as well as declaratory and injunctive relief. Boeing moves for summary judgment against all claims.

As more fully described below, Boeing required Kelley to submit to periodic drug tests by providing urine samples. Based on reports to Boeing given by two people who worked for an independent testing company, Boeing formed the good faith belief that Kelly had attempted to tamper with a urine collection sample that he was required to provide and then terminated Kelly's employment. Kelly denies that he tampered with the required urine sample. When an employer holds a good faith belief that a termination of employment is valid, the employer cannot be liable, even if it is later revealed that the termination was based on a factual mistake or misunderstanding. Kelly has identified no evidence to suggest that either of the two reporting individuals made their reports in bad faith or knew that their reports were false or inaccurate. Further, Kelly has identified no evidence to suggest that Boeing acted in bad faith or did not believe those reports in good faith. Thus, even if those reports were based on a factual misunderstanding of Kelly's actions, a conclusion that the Court need not reach, Kelly has failed to show a genuine issue for trial regarding whether Boeing had a lawful and valid basis for terminating Kelly's employment. Boeing's motion for summary judgment is granted.

## STANDARDS

A party is entitled to summary judgment if the "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party has the burden of establishing the absence of a genuine dispute of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The court must view the evidence in the light most favorable to the non-movant and draw all reasonable inferences in the non-movant's favor. *Clicks Billiards Inc. v. Sixshooters Inc.*, 251 F.3d 1252, 1257 (9th Cir. 2001). Although "[c]redibility determinations, the weighing of the evidence, and the

drawing of legitimate inferences from the facts are jury functions, not those of a judge . . . ruling on a motion for summary judgment," the "mere existence of a scintilla of evidence in support of the plaintiff's position [is] insufficient . . . ." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252, 255 (1986). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citation and quotation marks omitted).

## BACKGROUND

Kelly filed an administrative complaint with the Oregon Bureau of Labor and Industries on September 7, 2017, and he received a right to sue letter on January 18, 2018. The statute of limitations under Oregon law extends to one year before the filing of the administrative complaint. Or. Rev. Stat. § 659A.875(a). Thus, Kelly's claims for any events that occurred before September 7, 2016 are barred by the statute of limitations. The events occurring before September 7, 2016, however, are relevant to paint a picture of Kelly's employment at Boeing and the events leading up to his termination.

### A. Boeing's Drug Free Workplace Policy

Boeing has policies for the drug testing of its employees. Some employees, predominantly those who work in "safety-sensitive" jobs, are subject to U.S. Department of Transportation ("DOT") drug testing requirements, and federal regulations govern the procedures for those drug tests. ECF 64-1 at 12. Employees who do not perform "safety-sensitive" jobs are not subject to federal regulations governing drug test procedures but still may be subject to drug tests under Boeing's internal drug testing policies, which mirror the federal regulations in many ways. ECF 64-1 at 12. During the time period relevant to this lawsuit, Boeing engaged American Medical Response ("AMR") to collect urine samples for non-DOT drug tests. ECF 44-2 at 7. Boeing would schedule drug testing with AMR, and AMR would

dispatch emergency medical technicians ("EMTs") to conduct the testing. ECF 44-2 at 7. The EMTs who conducted drug tests were not Boeing employees. AMR employees are trained in administering breath alcohol tests and collecting urine samples to deliver to a lab for testing. AMR does not provide blood testing or hair testing, and Boeing does not use blood testing or hair testing in its drug testing policy. ECF 64-1 at 18. AMR employees do not themselves test the urine samples for drugs, but instead send the samples to an independent lab for testing. ECF 64-1 at 18.

## B. Boeing Hires Kelly

Kelly worked at Boeing from 2011 until January 12, 2017. In 2011, Boeing hired Kelly as a "CNC Machinist." ECF 44-1 at 87. Kelly filled out a post-offer employment health questionnaire and reported no medical conditions and attested that he had no restrictions for any type of work for medical reasons. ECF 44-1 at 89-92. Kelly also checked the boxes on the form indicating that he did not have any medical conditions or limitations that would keep him from performing the functions of the job and he did not require any modifications of the job in order to perform the job functions. ECF 44-1 at 92-93.

Kelly was diagnosed with celiac disease in 2010 or 2011 and with gout in 2012. ECF 44-3 at 65. Plaintiff contends that his celiac disease makes it difficult for him to urinate and also causes him frequently to need to use the restroom. ECF 44-3 at 65. Because of his celiac disease, Kelly has a handicap placard for his car, which allows him to park in handicap parking spaces to be closer to restrooms. ECF 44-3 at 65. Kelly also has an enlarged prostate, which he contends substantially impairs his urination. ECF 44-3 at 66. In 2012, Kelly claims that he told his then-supervisor Dan Deutsch that he needed to use the restroom frequently and requested to work closer to the bathrooms. In 2013 and 2014, Kelly asked his new manager, Kevin Miller, if he could work at machines closer to the bathroom and Miller accommodated his request. ECF 44-1

at 76. Kelly continued to work at machines closer to the restroom until the time he was terminated in 2017. ECF 44-1 at 76. In 2013 and 2014, Kelly told Bill Conway, Kelly's team leader, about his celiac disease and asked Conway to assign him to work on the floor. Conway agreed to Kelly's request and allowed Kelly to work on the floor until Kelly was terminated. ECF 44-1 at 77.[1]

In 2013, Kelly's wife was diagnosed with cancer. ECF 54 at 3. Kelly was her primary caregiver. ECF 54 at 3. Whether due to his own medical issues or his wife's illness, Kelly took several periods of intermittent FMLA leave during his employment at Boeing. ECF 55-26 at 1. Kelly testified that Boeing never denied his requests for leave. ECF 44-1 at 73.

Kelly lived in Vernonia, Oregon, and communed more than 60 miles each day to the Boeing facility in Gresham, Oregon, where he worked the "graveyard" shift from 10:45 p.m. until 5:45 a.m. Between caring for his wife during the day and working during the night, Kelly was fatigued. ECF 54 at 5. He also had difficulty sleeping due to his frequent need to use the restroom. ECF 44-1 at 18. On July 8, 2015, Kelly's supervisor, Miller, discovered Kelly sleeping at a machine. ECF 44-1 at 17; ECF 45 at 25.[2] Miller gave Kelly a verbal warning and told Kelly to see a nurse in the medical department. On July 16, 2015, a nurse at Boeing issued Kelly a "doze alert" earpiece that Kelly could wear on his ear, and the earpiece would "alert" if it sensed

---

[1] Kelly testified at deposition and submitted a declaration. To the extent that the declaration and the deposition are in direct contradiction on certain facts, the Court disregards those portions of the declaration and relies on the version of the facts that Kelly testified to under oath at his deposition. *See Yeager v. Bowlin*, 693 F.3d 1076, 1081 (9th Cir. 2012).

[2] Although Kelly testified at his deposition that he had fallen asleep and this version of events was consistent with Kelly's "Employee Statement" on the MERF form, ECF 45 at 25, he later disputed that fact in his declaration. This discrepancy does not create a triable question of fact because it is not material to the central dispute: Boeing's reasons for terminating Kelly in 2017.

him falling asleep. Kelly testified that he wore the earpiece for about a month and then stopped using it. 44-1 at 24.

On September 3, 2015, Kelly told his supervisor, Miller, that he experienced pain in his feet due to gout when he had to walk up steps. ECF 44-2 at 26. Miller gave Kelly a Medical Evaluation Report Form ("MERF") to complete and return to Boeing's medical department. ECF 44-2 at 26. Kelly filled out the form and claims that he turned it in to the medical department, although the medical department has no record of having received it. On the form, Kelly listed "strain on tendon" as the medical concern and wrote "I can't say" when asked what caused the medical issue. ECF 44-1 at 134. Kelly did not mention gout as the cause of his foot problems anywhere on the MERF form.

## C.  Kelly's Drug Test

On September 3, 2015, Kelly took a drug test, which tested positive for heroin. The parties dispute the events leading up to the drug test, but these factual disputes are not material for purposes of summary judgment. According to Kelly's manager, Miller, Kelly's team leader, Conway, told Miller that Kelly looked pale and "listed to the side." ECF 44-2 at 44. Miller testified that Conway told him that, when Conway asked Kelly if he was "okay," Kelly told Conway "I have been here since 9:00 p.m. and this is what alcohol and pain pills does to you." ECF 44-2 at 44. Miller claims that he and Kelly's temporary manager Andrew Campbell went to check on Kelly and discovered him sleeping in the cab of a machine while the machine was running. ECF 44-2 at 35. Miller testified that, when Kelly woke up he was groggy and belligerent, and raised his voice at Miller and Campbell. ECF 44-2 at 36. Miller testified that he and Campbell called security, who sent Kevin Martin to join Miller and Campbell. ECF 44-2 at 38. Miller testified that he asked Kelly if he was on any medication, and Kelly responded that he was on medication for his gout. ECF 44-2 at 39.

Under Boeing's drug free workplace policy, if a manager and another employee who has been trained in observing and documenting the symptoms of drugs or alcohol have reason to suspect that an employee may be under the influence of drugs or alcohol, they may request that the employee undergo a drug test. ECF 64-1 at 21. Miller and Martin prepared what Boeing refers to as a "Request to Test" form based on reasonable suspicion that Kelly was intoxicated. ECF 44-2 at 47. Kelly complied with the request to test and provided a urine sample for a drug test. Kelly's test results were positive for heroin. ECF 64-1 at 53. Kelly requested a split-specimen test (where the un-tested remainder of the original sample is tested) and the split-specimen test also tested positive for heroin.

Kelly denies ever using heroin. ECF 54 at 7. He also denies sleeping on the night of September 3, and he denies being belligerent or raising his voice. Kelly believes that Miller was biased against him and that Miller and Martin lacked reasonable suspicion to order a drug test. Kelly does not dispute, however, that the results of both the initial test and the split-specimen test were positive for heroin, although he believes that the test results were a false positive. ECF 54 at 7. Kelly consulted with his union representative, who advised him that he had two options. Kelly could remain employed at Boeing if he agreed to enter into the drug-free workplace program sponsored by Boeing and comply with the program's requirements, including unannounced drug testing, for three years. ECF 44-2 at 105. Alternatively, Kelly could be terminated by Boeing and then his union would grieve and arbitrate his termination. ECF 44-2 at 106.

## D. The Last Chance Agreement

On September 11, 2015 Kelly signed a Compliance Notification Memo and entered into Boeing's drug free workplace program. ECF 44-1 at 136. In entering into the agreement, Kelly agreed that he would be subject to unannounced drug testing for a three-year period and agreed

that a positive drug test, a confirmed alcohol result, or a refusal to test would be grounds for termination of his employment. ECF 44-1 at 136. A refusal to test was defined under Boeing policy to include "tampering or otherwise invalidating by means including adulteration, dilution, substitution, or failure to cooperate in any part of the drug testing process." ECF 55-4 at 7. Kelly also agreed that he and his union would waive any right to challenge any termination of employment resulting from a violation of the conditions in paragraphs (1) and (3) of the Last Chance Agreement, which described the drug testing policy. ECF 44-1 at 236.

Kelly waived his right to grieve or dispute the Last Chance Agreement. Kelly never indicated that he could not take urine drug tests or that he would need an accommodation from the testing requirements due to his celiac disease. Between October 2015 and January 11, 2017, Kelly successfully completed fifteen urine tests. ECF 44-1 at 138; ECF 54 at 8. None tested positive for heroin or any other drug. ECF 44-1 at 138.

In March 2016, Boeing investigated Kelly for comments that he made about wanting to kill his supervisor, Kevin Miller. Kelly testified that he said "something similar" to a statement that "if Kevin Miller ever caused [him] to lose[his] job, [he] would kill him." ECF 44-1 at 44. Kelly testified that he and his coworkers "were talking about—about Mr. Miller harassing everybody, and I said, man, if anybody (indicating) with my family, then I'd kill them." ECF 44-1 at 44. Kelly explained that he felt that Miller was harassing him, and he "got upset." ECF 44-1 at 45. Boeing issued a corrective action notice to Kelly and suspended him from work without pay. ECF 64-1 at 57. The plan was to suspend Kelly for five days, but Boeing erroneously suspended him for fourteen days. ECF 64-1 at 58. Kelly's union grieved the suspension and Boeing agreed to settle with Kelly by paying him $1239. ECF 64-1 at 59-60.

### E. The January 12, 2017 Drug Test

On January 9, 2017, the Portland metropolitan area experienced a severe snowstorm. On January 10, 2017, Kelly left his home to drive to work for his evening shift. ECF 54 at 10. After driving for two hours and traveling 30 miles, Kelly learned that the highway was closed, and he decided to spend the night in a hospital parking lot to wait out the storm. ECF 54 at 10. Kelly claims that he contacted his temporary supervisor, Mark MacKinnon and told him that he was waiting for the roads to clear and then he would drive in to work.[3] ECF 54 at 10-11. Early on the morning of January 11, 2017, Kelly learned that his home in Vernonia had lost electricity and he states that he again called MacKinnon, this time to tell him that he would be taking FMLA leave to return home and care for his sick wife. ECF 54 at 11. Later that evening, Kelly learned that the road to his home was closed, so he decided to go in to work. He arrived at work at 10:30 p.m. ECF 54 at 11.

Early in the morning of January 12, 2017, Kelly took a lunch break, drank a bottle of water, and ate a sandwich made with gluten-free bread. ECF 54 at 11. Kelly claims that during his lunch break, he retrieved a yellow and blue plastic tube that he used to hold coins. ECF 54 at 11. Kelly then called his wife to get an update on whether the electricity was back on and states that he then called MacKinnon again to tell him that he would be taking FMLA leave for the remainder of the week. ECF 54 at 12.

Kelly's shift ended at 5:45 a.m. Before his shift ended, Plaintiff cleaned his station and went to the restroom and urinated. At 5:41a.m. Kelly went to the parking lot to warm up his car. Kelly then went back to his locker to put away his shoes. ECF 54 at 12.The day shift supervisor,

---

[3] Boeing disputes that Kelly ever called Mark MacKinnon in 2017, as Boeing's records show that MacKinnon retired from Boeing in 2012.

James Whiteman approached Kelly and told him that he had to go to the medical trailer to provide a urine and breath sample for a drug and alcohol test. ECF 54 at 13. Kelly claims that Whiteman approached him at 5:47am, after Kelly had clocked out. Boeing contends that Kelly was told about the drug test before his shift ended and Kelly arrived at the test at 5:45am.

Whiteman told Kelly that an EMT had been waiting for an hour to take Kelly's urine and breath samples. ECF 54 at 13. Kelly claims that he told Whiteman that he had already requested FMLA leave for the remainder of the week and wanted to leave and go home to his wife. ECF 54 at 13.Whiteman accompanied Kelly to the trailer where drug tests are conducted and then left. Kelly claims that it was Boeing procedure that a supervisor always be present during a drug test, but Whiteman was not present for the testing on January 12, 2017. ECF 54 at 13.The parties dispute the circumstances of the January 12, 2017 drug test, and it is this dispute that gives rise to the present lawsuit.

AMR dispatched EMT Carla Scroggins to administer Kelly's drug and alcohol test on January 12, 2017. Scroggins arrived at the Boeing plant at around 4:45 a.m. but did not begin the test on Kelly until more than an hour after she arrived. ECF 44-2 at 57. Scroggins first administered a breath alcohol test to Kelly. The breath alcohol test was negative for alcohol. ECF 44-2 at 60.

Scroggins then prepared the paperwork for Kelly's urine sample. ECF 55-14 at 1. Kelly told Scroggins that he had just recently emptied his bladder. ECF 54 at 14, 44-2 at 62. Scroggins asked Kelly to empty his pockets and place his belongings on the table before he entered the restroom. Plaintiff then washed his hands with water but no soap. Scroggins gave Kelly a plastic cup and Kelly went into the bathroom to produce a urine sample. ECF 54 at 15. Scroggins did

not follow Kelly into the bathroom, because AMR policy mandates that only EMTs of the same sex may conduct direct observations of a urine collection. ECF 44-2 at 86.

Scroggins claims that she heard no noises inside the bathroom, which she found suspicious. She testified in her deposition that typically she hears the sound of urine flowing into the toilet after an individual has filled up the testing cup, because people rarely produce exactly the amount of urine needed to fill the cup. ECF 44-2 at 64. Kelly claims that he spoke to Scroggins through the door and told her that he was having difficulty producing enough urine. ECF 54 at 15. Eventually Kelly left the restroom and handed Scroggins the plastic cup with his sample. The parties agree that Scroggins did not find Kelly's first urine sample adequate, albeit for different reasons, and Scroggins directed Kelly to try again.

Kelly claims that Scroggins told him that he had not produced a sufficient quantity of urine and she directed him to try again. ECF 54 at 15. Scroggins claims that the temperature strip in the cup remained black, indicating that the liquid in the cup was not warm enough. ECF 44-2 at 94; ECF 55-18 at 1 (Scroggins notes "1st attempt not within temperature range"). Scroggins claims she poured the liquid into a second cup in case the temperature strip in the first cup was defective, but the strip remained black. ECF 44-2 at 94. Scroggins believed that Kelly may have tampered with the sample. ECF 44-2 at 68. The parties do not dispute that Scroggins asked Kelly to produce a second sample.

Kelly asserts that he produced a second sample and gave it to Scroggins and observed her pouring the urine into testing vials. ECF 54 at 16. Kelly states that Scroggins then told him that she had thrown his urine away because it had been too cold. ECF 54 at 16. Scroggins states that Kelly did not produce a second sample but instead asked to see a supervisor. ECF 44-2 at 94. The parties agree that Kelly told Scroggins that he needed to drink some coffee to help produce

another sample. Scroggins told Kelly that after the testing had begun, she could not allow Kelly to leave the testing room alone, so she would accompany him.

The two of them left the testing center together. Kelly had his wallet with him at all times. ECF 544 at 16. Nonetheless, Kelly first went to his locker to search for money. ECF 54 at 17. After searching through his locker without finding anything, Kelly went to a second locker and searched that locker as well. ECF 54 at 17. Scroggins states that after Kelly searched the second locker, they returned to the first locker to search some more, and then went to Kelly's car to search there. The parties agree that Kelly then searched through a trash can and retrieved socks and a tube. ECF 54 at 17. Kelly asserts that this is the blue and yellow tube that he uses to hold coins. ECF 54 at 17.

Scroggins claims that she saw a tube with a blue lid containing yellow liquid and that Kelly immediately tried to hide the tube up his sleeve. ECF 44-2 at 93-94 (Scroggins reporting that she observed Plaintiff pull out of the trash can "a plastic vial with blue cap that contained a yellow liquid, which I immediately recognized as urine"). Scroggins believed that the tube contained urine, so she called for AMR to dispatch a second officer, this time one of the same gender as Kelly, to do an observed collection. ECF 44-2 at 80. Under Boeing's policy, if an EMT believes that a sample has been tampered with, the EMT should conduct a second collection, this time under direct observation. ECF 44-3 at 49. Under Boeing's policy, if an individual is unable to produce sufficient urine for a drug test after three hours, they are referred to a physician for a medical evaluation. ECF 44-3 at 52. The three-hour window starts over at each collection attempt. ECF 54-24 at 28.

Kelly then went to an ATM and withdrew $300; he then purchased a cup of coffee in the Boeing cafeteria. ECF 54 at 17. On the way back from the cafeteria to the testing trailer, Kelly

and Scroggins stopped at the office of David Winters, a union representative. ECF 54 at 18. Kelly claims that he complained to Winters that he was being asked to stay for the drug testing after his shift had ended, and Scroggins told Winters that Kelly had a shy bladder. ECF 54 at 18. Winters testified that Scroggins told him that she had seen a vial, and Kelly had stated that it was his coin holder. ECF 44-3 at 37.At this point, it was around 7:35am. Kelly states that he asked to see a doctor because he had a medical condition that prevented him from producing urine on demand. ECF 54 at 18. Kelly adds that he told Scroggins and Winters that he had requested FMLA leave and wanted to go home. ECF 54 at 18. At some point, the parties agree that Boeing's human resources representative Caroline Muir arrived at the testing trailer.

Brady Edge, a male EMT who worked for AMR, also arrived at the Boeing facility. The parties disagree over what time Edge arrived at Boeing, but the parties agree that Edge accompanied Plaintiff into the restroom for an observed urine sample. Kelly states that he attempted to urinate, but was unable to produce urine and he told Edge that he had a prostate condition that made it difficult for him to produce urine. ECF 54 at 19. Edge claims that he saw Kelly withdraw a vial with a blue top and pour a yellow liquid into the urine collection cup. ECF 44-1 at 171.[4] Edge reported the vial of liquid to Muir and contacted Michael Lockman, the head of Boeing's drug free workplace program. ECF 44-1 at 171. Edge reported to Lockman that he had seen Kelly tamper with the drug test by pouring liquid from a vial into the plastic testing cup. ECF 44-1 at 171 (Edge reporting that he observed Kelly bring his "left hand from his side,

---

[4] During Kelly's deposition, he responded "I did" when asked "You brought your left hand from your side and you upended a vial into the collection cup, correct?" ECF 44-1 at 70. Later in the deposition, Kelly's counsel asked Kelly again if he ever took a vial of liquid and poured it into any of the testing samples and Kelly responded that he did not. ECF 55-29 at 7. Kelly denies ever tampering with the samples. For purposes of this motion, the Court accepts Kelly's denial.

upending a vial into collection cup").[5] Edge testified that Lockman told him that tampering with a urine test is considered a refusal to test under Boeing policy and that testing should not continue. ECF 44-1 at 171. Lockman does not recall the specific facts of Kelly's January 12, 2017 drug test but testified that he had no reason to believe that the reports from the EMTs regarding what had transpired were not honest or accurate. ECF 44-3 at 58. Edge then asked Kelly to empty his pockets in order to retrieve the vial, but Kelly did not produce the vial. Edge did not try to pat down Kelly or otherwise search for the vial. ECF 44-1 at 171.

Kelly claims that, after the first attempt during which he was unable to produce enough urine, he told Edge that he needed a break and Edge agreed that Kelly could take a break. ECF 54 at 19. Kelly states that he told Muir that his shift was over and that he had requested FMLA leave and wanted to go home to his wife but Muir told him he had to stay. ECF 54 at 19-20. Kelly asserts that he went into the restroom with Edge to attempt a second observed urine collection. Kelly adds that Edge was using his mobile telephone while Kelly waited for urine to come. This time, Kelly states that he filled the cup to the line, then handed it to Edge but Edge told him that he had not seen the urine come out of Kelly's body. Kelly remembers that Edge then told Kelly that "he [saw] something in my left hand with a blue top." ECF 54 at 20. Kelly asserts that he then emerged from the restroom and told Muir that he could not give a sample for medical reasons and that he requested to be taken to a doctor for a blood test or a hair test, but Muir told him he had to give a sample on-site. ECF 54 at 20. Kelly testified that he was told that he had failed the test and he was going to be fired. ECF 44-1 at 72.

---

[5] Edge testified that after observing Kelly pour liquid from a vial into the collection cup, he asked Kelly to empty his pockets in order to retrieve the vial, but did not attempt to pat Kelly down. ECF 44-1 at 164. Kelly asserts that Edge never attempted to search for the vial. For purposes of summary judgment, the Court accepts Kelly's version of events.

Edge left Boeing to go write his incident report. ECF 44-1 at 171. The day shift supervisor Ron Ejian arrived at the testing trailer and told Kelly that he was going to take Kelly's badge for failure to provide a urine sample. Kelly claims Ejian told him that he was going to be terminated for failing to give a sample, but Kelly responded that he could not give a sample for medical reasons. ECF 54 at 20. At around 10 a.m. Muir told Kelly he could go home. Boeing security officials called a taxi to drive Kelly home, but the taxi refused to drive Kelly the 60 miles needed for him to get home and instead dropped him off at a motel. Kelly stayed at the motel from January 12 until January 14, 2017, when he returned to the Boeing facility and was then informed that he had been fired. Boeing sent a letter to Kelly informing him that his January 12, 2017 test had been deemed a refusal to test. Boeing's Drug Free Workplace Follow-Up Program Summary Report lists the result of the January 12, 2017 urinalysis test as "Refusal-Adulterated." ECF 44-2 at 17.

## DISCUSSION

### A. Waiver

Boeing argues that Kelly has waived any claims arising out of his termination for violating the Last Chance Agreement because that agreement contained a provision stating that Kelly "waive[d] any right to challenge any termination pursuant to paragraphs (1) or (3) through any court, arbitration, or other form or proceeding . . . [A] refusal to test determination . . . during the unannounced follow-up testing period will be grounds for Employee's termination of Employment." ECF 64-1 at 54.

The Court declines to find that Kelly has lost his ability to challenge his termination in court because Kelly does not agree that he was terminated pursuant to paragraphs (1) or (3) of the Last Chance Agreement but instead believes that he was terminated because of his disability or in retaliation for asking for an accommodation for his disability, or because he attempted to

exercise his right to protected family medical leave. Kelly is therefore not challenging "any termination pursuant to" the Last Chance Agreement but instead is challenging what he contends was an unlawful discriminatory and retaliatory termination in violation of the ADA, the ORA, the FMLA, and the OFLA, as well as common law. Any events occurring outside the statute of limitations, in this case before September 7, 2016, are, as Kelly agrees, not challenged by this lawsuit.

**B. Disability Discrimination and Retaliation**

The Court analyzes Plaintiff's claims under the Oregon Rehabilitation Act and the ADA together because the "state statute is to be construed 'to the extent possible in a manner that is consistent with any similar provisions of the Americans with Disabilities Act.'" *Leinenbach*, 2018 WL 6531646, at *12 (citing Or. Rev. Stat. § 659A.139); *see also Atwood v. PCC Structurals, Inc.*, 2015 WL 3606323, at *9 (D. Or. June 4, 2015) ("The standard for establishing a *prima facie* case of discrimination under Oregon law is identical to that used in federal law."). To establish a *prima facie* case of disability discrimination under the ADA (and thus, also under Oregon law), a plaintiff must show "(1) that she is disabled within the meaning of the [statute]; (2) that she is a qualified individual with a disability; and (3) that she was discriminated against because of her disability." *Smith v. Clark Cty. Sch. Dist.*, 727 F.3d 950, 955 (9th Cir. 2013). A plaintiff must establish that the defendant's actions were motivated, at least in part, by an unlawful discriminatory (or retaliatory) animus. *Head v. Glacier Nw. Inc.*, 413 F.3d 1053, 1065 (9th Cir. 2005).

The Court applies "the familiar burden-shifting framework outlined in *McDonnell Douglas Corp. v. Green*" to ADA and Oregon disability discrimination and retaliation claims. *Mayo v. PCC Structurals, Inc.*, 795 F.3d 941, 943 (9th Cir. 2015) (citing *Snead*, 237 F.3d at 1092-93). "Under that framework, an employee challenging an adverse employment action has

the initial burden of establishing a *prima facie* case of discrimination (or retaliation). The burden then shifts to the employer to provide a legitimate, nondiscriminatory (or nonretaliatory) reason for the adverse employment action. If the employer does so, then the burden shifts back to the employee to prove that the reason given by the employer was pretextual." *Curley v. City of N. Las Vegas*, 772 F.3d 629, 632 (9th Cir. 2014). The Supreme Court has instructed that "the plaintiff may establish pretext 'either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence.'" *Godwin v. Hunt Wesson, Inc.*, 150 F.3d 1217, 1220 (9th Cir.1998) (quoting *Texas Dept. of Cmty. Affairs v. Burdine*, 450 U.S. 248, 256 (1981)).

Assuming, without deciding, that Kelly's celiac disease and enlarged prostate, which cause frequent urination and difficulty urinating, are disabilities under Oregon and Federal law, the Court nonetheless finds that Boeing has articulated a legitimate, non-discriminatory, non-retaliatory reason for terminating Kelly's employment.[6] Kelly does not dispute that Edge and Scroggins *believed* that they observed a vial with a blue top that contained urine, but Kelly contends that they are mistaken and that they actually observed his coin holder. Kelly recalls that Edge told Kelly that Edge saw something with a blue lid during one of the collection attempts. Kelly also does not dispute that Edge and Scroggins reported witnessing Kelly with a vial with a blue lid containing a yellow liquid, and that they documented their observations in their reports. Kelly contends that Edge and Scroggins confused his coin holder for a vial of urine, but Kelly

---

[6] Boeing contends that Kelly's difficulties with urination are not an impairment that substantially limits one or more major life activities, here the life activity of urination, because Kelly admits that he was "generally able to take urine tests," he had produced sixteen adequate urine samples between September 2015 and January 2017, and he attributed his inability to produce a urine sample to Scroggins to the fact that he had just recently emptied his bladder successfully. The Court need not resolve this dispute in order to decide the pending motion.

has not presented a genuine dispute of material fact as to what Scroggins and Edge believed that they saw and what they reported seeing, including to Lockman, the head of Boeing's drug free workplace program. See ECF 44-2 at 171 (Edge reporting that he observed Kelly bring his "left hand from his side, upending a vial into collection cup"); ECF 44-2 at 93 (Scroggins reporting that she observed Kelly pull out of the trash can "a plastic vial with blue cap that contained a yellow liquid, which I immediately recognized as urine").

Kelly also claims that he was retaliated against for requesting a reasonable accommodation for his disability, but the only person he ever claims that he requested an accommodation from before the drug test ended was Scroggins, who was not a Boeing employee. ECF 44-3 at 72. Boeing policy requires all requests for a reasonable accommodation for a disability to be submitted via the Medical Information System by filing out a Reasonable Accommodation Request form. ECF 43 at 3. It is undisputed that Kelly did not fill out a Reasonable Accommodation Request form and his only request for an accommodation for his disability regarding his difficulty urinating was verbally requesting a blood test or a hair test from Scroggins.

Kelly does not dispute that an attempt to tamper with or adulterate a urine sample is considered a refusal to test under Boeing policy and that a refusal to test is grounds for termination for an employee, like Kelly, on a Last Chance Agreement. ECF 44-1 at 97. Kelly also does not dispute that he received a notice informing him that Boeing determined that his January 12, 2017 test resulted in a refusal to test. ECF 44-1 at 143. Plaintiff does not dispute that the January 12, 2017 urinalysis test result was recorded in Boeing's Drug Free Workplace Follow-Up Summary as "Refusal-Adulterated." ECF 44-2 at 17. Although Kelly characterizes his termination as caused by his inability to produce sufficient urine, Boeing policy does not

include inability to produce sufficient urine within its definition of refusal to test. See ECF 44-1 at 97 ("Refusal to test also means tampering or otherwise invalidating by any means including adulteration, dilution, substitution, or failure to cooperate in any part of the testing process."). Kelly's assertion that his inability to produce a sufficient volume of urine was the cause of his termination is directly contradicted by undisputed evidence that Boeing's contemporaneous documents and reports from Edge and Scroggins document adulteration of the urine sample. Boeing maintains that it terminated Kelly because Edge reported that he observed Kelly pour yellow liquid from a vial into the testing cup. On January 12, 2017, Lockman emailed Ludwig with information about what behavior constitutes a refusal to test. ECF 55-31 at 1.

When an employer holds a good faith belief that a termination is valid, the employer cannot be liable when it is later revealed that the basis for termination was based on a mistake or a misunderstanding. *Villiarimo v. Aloha Island Air, Inc.*, 281 F.3d 1054, 1063 (9th Cir. 2002). "In judging whether [an employer's] reasons were 'false,' it is not important whether [the employer's reasons] were *objectively* false . . . . Rather, courts 'only require than an employer honestly believed its reason for its actions, even if its reason is 'foolish or trivial or even baseless.'" *Id.* (quoting *Johnson v. Nordstrom, Inc.*, 260 F.3d 727, 733 (9th Cir. 2001)). But "evidence of a decisionmaker's mistaken judgment is not dispositive of the question of pretext unless that evidence would permit the factfinder to conclude that the stated nondiscriminatory justification for the adverse employment action was either knowingly false or made in bad faith." *Murray v. Kindred Nursing Ctrs. W. LLC*, 789 F.3d 20, 27 (1st Cir. 2015). Kelly has pointed to no evidence to suggest that Scroggins and Edge made their reports of seeing a vial in bad faith or knew that such reports were false, or that Boeing, in believing Scroggins's and Edge's reports, acted in bad faith. Thus, even if both Edge and Scroggins were mistaken about seeing a vial full

of yellow liquid, if Boeing held a good faith belief that Kelly had, in fact, possessed a vial and attempted to tamper with the urine collection sample, Boeing would have a valid basis for terminating Kelly's employment. *See Risby v. Nielsen*, 768 F. App'x 607, 611 (9th Cir. 2019) ("But even if his decision was faulty in some way, an inference of pretext does not arise solely from an honest mistake."). Lockman testified that he had no reason to doubt the veracity or credibility of Scroggins and Edge, and Kelly has pointed to no evidence that would suggest otherwise.

Kelly contends that Boeing's stated reason for Kelly's termination is pretext, and he advances two arguments in support of that contention. First, Kelly argues that temporal proximity provides circumstantial evidence that Boeing's actions were motivated by discriminatory and retaliatory animus. Second, Kelly contends that Boeing failed to follow the federal regulations and Boeing policy for drug testing. Neither argument, however, establishes a genuine dispute of fact as to whether Boeing's stated reasons for terminating Kelly's employment were pretextual.

Just a few hours passed between Kelly's inability to produce urine, his request for an alternative testing method using either blood or hair, and his termination. Temporal proximity can, at times provide sufficient circumstantial evidence of discriminatory or retaliatory motive to create a genuine dispute of fact that a jury must resolve. When a court considers temporal proximity as evidence of an unlawful motive, however, the court is not required to disregard all other evidence of the context and undisputed facts and circumstances. "Although the timing of these events suffices to establish a minimal prima facie case of retaliation, it does nothing to refute the [defendant's] [proffered] legitimate reasons." *Hashimoto v. Dalton*, 118 F.3d 671, 680 (9th Cir. 1997). Kelly was terminated promptly after the events of the drug test on January 12,

2017, because tampering with the urine collection process constitutes a refusal to test under Boeing's policy and according to the compliance memorandum that Kelly signed, a refusal to test would result in his immediate termination. The close temporal proximity between the unsuccessful attempt to collect a urine sample from Kelly and his termination does not undermine in any way Boeing's explanation for its actions.

Kelly also claims that Boeing failed to follow federal regulations and its own procedures during the drug test, and that this demonstrates that the drug test was a pretext to hide Boeing's discriminatory and retaliatory motives. Because Kelly did not work in a "safety-sensitive" job, Kelly was not subject to federal regulations regarding drug testing. Boeing did mirror some of the federal regulations in its own drug-testing procedures, but Boeing was not required to comply with federal regulations in Kelly's case. His argument that Boeing violated federal regulations by testing Kelly after his shift had ended, therefore, does not undermine Boeing's proffered explanation for Kelly's termination. Lockman testified that Boeing's policy does not prohibit testing employees after their shifts end and that if a drug test takes three hours or longer, it might likely continue beyond an individual's shift. ECF 55-24 at 18 (Lockman testifying that "if someone's workday ended during that three hours [for the collection attempt], the attempt to collect a specimen would continue until either a specimen was collected or the three hours was complete.").

Kelly selectively quotes from Lockman's deposition regarding Defendant's drug testing procedures. Lockman testified that an out of temperature sample (one that causes the temperature strip to turn black) is not by itself a refusal to test, but that attempting to adulterate or tamper with a urine sample does constitute a refusal to test. ECF 44-3 at 49-50. Kelly also asserts that three hours after the testing attempt began, Boeing was required to stop attempting to collect a

sample from Kelly and was required to take Kelly to a hospital for a physical examination. Kelly, however, omits the portion of Lockman's deposition where Lockman explains that the three-hour clock resets from each collection attempt. ECF 55-24 at 28. Lockman also explained that in this case there were two collection attempts and the three-hour clock reset at each collection attempt. ECF 55-24 at 28. Under Boeing's policy, because Scroggins suspected that Kelly may have tampered with the first out of temperature urine sample he provided, she was required to call for an observed collection. Kelly does not dispute this procedure and relies on non-binding federal regulations that state that "[i]f the specified temperature is outside the acceptable range you must immediately conduct a new collection using direct observation procedures." 49 C.F.R. § 40.65(b)(6). Although Kelly contends that Boeing violated federal regulations by waiting for Edge to arrive rather than having Scroggins conduct the observed collection *immediately*, AMR policies required that a male EMT conduct an observed collection of a male employee. Boeing and AMR followed their own policies when they requested a second collection and waited for a male EMT to conduct an observed collection. ECF 44-1 at 154 (Edge testifying that AMR protocol required male EMTs to do direct observation drug tests on males); ECF 44-2 at 86 (Scroggins testifying that AMR protocol required observed collections to be performed by an EMT of the same gender).

Finally, Kelly contends that Boeing violated its own testing policies by not sending the out of temperature or insufficient quantity urine samples that Plaintiff produced on January 12, 2017 to a lab for testing. But Lockman testified that Boeing's policy does not require that samples be tested if the sample has been tampered with or adulterated. Edge reported that he had observed Kelly tamper with the sample, so Edge was not required to send the samples to a lab for testing.

None of Kelly's arguments undermines Boeing's legitimate, non-retaliatory, non-discriminatory reasons for Kelly's discharge. Kelly does not dispute that Edge and Scroggins believed they saw a vial of urine, reported seeing a vial of urine, and that Kelly's employment was promptly terminated based on Boeing's good faith belief that Kelly had tampered with or adulterated his urine sample.

## C. FMLA and OFLA

Because courts construe the OFLA "to the extent possible in a manner that is consistent with any similar provisions of the federal" FMLA, the Court will analyze Kelly's FMLA and OFLA claims together. Or. Rev. Stat. § 659A.186(2). The FMLA, enacted in 1993, was intended "to achieve a balance that reflected the needs of both employees and their employers." *Bachelder v. Am. W. Airlines, Inc.*, 259 F.3d 1112, 1119 (9th Cir. 2001). Under the FMLA, employees are entitled to a total of 12 workweeks of leave during any 12-month period when "a serious health condition . . . makes the employee unable to perform the functions of the position of such employee." 29 U.S.C. § 2612(a)(1)(D). The goal of the FMLA is "to balance the demands of the workplace with the needs of families," and "to entitle employees to take reasonable leave for medical reasons," "in a manner that accommodates the legitimate interests of employers." 29 U.S.C. § 2601(b).

The FMLA "creates two interrelated substantive rights for employees." *Xin Liu v. Amway Corp.*, 347 F.3d 1125, 1132 (9th Cir. 2003). "[F]irst, the employee has a right to use a certain amount of leave for protected reasons, and second, the employee has a right to return to his or her job or an equivalent job after using protected leave." *Bachelder*, 259 F.3d at 1122. To vindicate those rights, the courts have recognized two theories of recovery: the retaliation or discrimination theory, and the entitlement or interference theory. *Sanders v. City of Newport*, 657 F.3d 772, 777 (9th Cir. 2011). Discrimination or retaliation claims arise from violations of the

provision of the FMLA that makes it "unlawful for any employer to discharge or in any other manner discriminate against any individual for opposing any practice made unlawful by this subchapter." *Id.* (quoting 29 U.S.C. § 2615(a)(2)). Interference claims, on the other hand, arise from employers' attempts to "'interfere with, restrain, or deny the exercise of or the attempt to exercise' the substantive rights guaranteed by the FMLA." *Id.* at 777-78. (quoting 29 U.S.C. § 2615(a)(1)).

Although Kelly pleads both a discrimination claim and an interference claim, there is no evidence in the record, or facts alleged in the complaint, that could lead a reasonable jury to conclude that Kelly ever opposed a practice made unlawful under the FMLA or the OFLA. Because Kelly has neither responded to Boeing's argument nor cited any evidence to show that he participated in any enforcement proceedings as required by § 2615(b) or opposed any practice made unlawful by the FMLA as required by § 2615(a)(2), his OFLA and FLMA discrimination claims fail as a matter of law. *Leinenbach v. Washington Cty.*, 2018 WL 6531646, at *11 (D. Or. Dec. 11, 2018). Thus, Kelly's claims focus only on his termination after taking what he claims was protected FMLA and OFLA leave. The Court therefore construes Kelly's FMLA and OFLA claims only as interference claims.

To establish a *prima facie* case for an interference claim when, as here, the employer fails to reinstate the employee, the employee must show: "(1) he was eligible for the FMLA's protections, (2) his employer was covered by the FMLA [or OFLA], (3) he was entitled to leave under the FMLA [or OFLA], (4) he provided sufficient notice of his intent to take leave, and (5) his employer denied him FMLA [or OFLA] benefits to which he was entitled." *Sanders*, 657 F.3d at 778 (quoting *Burnett v. LFW Inc.*, 472 F.3d 471, 477 (7th Cir. 2006)).

Kelly states in his brief that "Boeing terminated Kelly's employment because it refused to accommodate his disability; Kelly's disability, his inability to produce a urine sample Boeing deemed 'sufficient' was the reason for the termination. *There was no other reason for the termination*." ECF 53 at 29. In order to survive summary judgment on his OFLA/FMLA interference claim, Kelly must show that his "taking FMLA-protected leave constituted a negative factor in" an employment decision. *Bachelder*, 259 F.3d at 1125. Kelly can do so using either direct or circumstantial evidence, or both. *Sanders*, 657 F.3d at 778.

Federal regulations interpreting the FMLA provide that "[n]othing in this section shall be construed to entitle any restored employee to . . . any right, benefit, or position of employment other than any right, benefit or position to which the employee would have been entitled had the employee not taken the leave." 29 U.S.C. § 2614(a)(3)(B). Although an employer is liable for FMLA violations even when the employer did not know that its conduct violated the Act, the employer's intent is not irrelevant in FMLA interference claims. The employee's FMLA leave must have influenced the employer or constituted a factor in its decision to terminate him. *Xin Liu*, 347 F.3d at 1136. Kelly contends that the only person whom he told he was taking FMLA leave was Mark MacKinnon. Kelly has put forth no evidence that his request for FMLA leave for the remainder of the week, which neither Edge nor Scroggins nor Lockman was aware of, constituted a factor in the decision to terminate Kelly's employment. Kelly has not shown and cannot show that he would have been entitled to his position of employment had he not taken leave because he would have been terminated under the Last Chance Agreement regardless of whether he had requested leave.

## D. Common Law Wrongful Discharge

"Under Oregon law, the common law remedy for wrongful discharge or termination is available only in the absence of an adequate statutory remedy." *Arnold v. Pfizer, Inc.*, 970 F.

Supp. 2d at 1145. "[A] claim for common law wrongful discharge is not available in Oregon if (1) an existing remedy adequately protects the public interest in question, or (2) the legislature has intentionally abrogated the common law remedies by establishing an exclusive remedy (regardless of whether the courts perceive that remedy to be adequate)." *Id.* at 1145-46. Oregon law provides a cause of action for wrongful termination based on disability discrimination or denial of medical leave and provides exclusive statutory remedies. *See* Or. Rev. Stat. § 659A.112 (providing a cause of action for disability discrimination); Or. Rev. Stat. § 659A. § 183. Accordingly, Boeing's motion for summary judgment on Kelly's common law wrongful discharge claim is granted.

## E.  Intentional Infliction of Emotional Distress

> To state a claim for intentional infliction of severe emotional distress, a plaintiff must plead that (1) the defendant intended to inflict severe emotional distress on the plaintiff, (2) the defendant's acts were the cause of the plaintiff's severe emotional distress, and (3) the defendant's acts constituted an extraordinary transgression of the bounds of socially tolerable conduct.

*McGanty v. Staudenraus*, 321 Or. 532, 543 (1995) (quotation marks and citation omitted). Kelly has not established a genuine issue that Boeing's actions constituted an "extraordinary transgression of the bounds of socially tolerable conduct." *Id.* Furthermore, Kelly has not established a genuine issue that Boeing, through Scroggins, Edge, Lockman, Ludwig, or any of the other actors who contributed to Kelly's termination, intended to inflict severe emotional distress on Kelly. Kelly asserts that the Boeing caused him emotional distress by not allowing him to drive home to his ailing wife after his employment was terminated and instead hiring a taxi driver, who Boeing should have known, Kelly argues would not have been willing to drive Kelly the nearly 60 miles to his home. Even if Boeing should have known that no taxi driver would have been willing to drive Kelly back to his ailing wife, this amounts to no more than

negligent infliction of emotional distress, which is not alleged. Boeing's motion for summary

judgment on Kelly's claim for intentional infliction of emotional distress is granted.

## CONCLUSION

Defendant's Motion for Summary Judgment (ECF 42) is granted. Defendant's Motion to

Compel an Independent Medical Examination (ECF 51) is denied as moot. Defendant's Motion

for Disqualification of Counsel (ECF 65) is denied as moot.

**IT IS SO ORDERED**.

DATED this 15th day of August, 2019.

*/s/ Michael H. Simon*
Michael H. Simon
United States District Judge